UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                   :

XIAO DONG FU and CHAU LAN NG,   :
                                   :

                Plaintiffs,   :

                                   :

              v.            :

                                   :

RED ROSE NAIL SALON INC. d/b/a RED   :
ROSE NAIL & SPA, WEN CHEN, YING   :
ZHOU, and JOHN DOES and JANE DOES   :
#1-10,                                 :

                                   :

           Defendants.   :
                                   :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 26, 2018

15 Civ. 7465 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge[1]:

      Plaintiffs Xiao Dong Fu ("Fu") and Chau Lan Ng ("Ng") previously worked for Defendants Wen Chen ("Chen") and Ying Zhou ("Zhou") at their business, Red Rose Nail Salon Inc. ("Red Rose," and together with Chen and Zhou, "Defendants"). Plaintiffs allege that during their employment, Defendants failed to pay Plaintiffs required wages and to provide Plaintiffs with required wage notices and statements, in violation of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219, and the New York Labor Law (the "NYLL"). The case proceeded to a bench trial in August 2017. In this Opinion, the Court provides its Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52.

---

[1]     The Clerk of Court is directed to modify the caption as shown above.

The Court has reviewed the trial transcript, the trial exhibits, and the parties' post-trial submissions. The Court's review of these documents is enhanced by its own recollection of the trial and assessment of the credibility of the witnesses. For the reasons that follow, the Court finds for the Plaintiffs and awards them damages plus prejudgment interest.

## FINDINGS OF FACT[2]

### A. Red Rose

Incorporated on or about April 2, 2004, Red Rose operates as a nail salon on West 72nd Street in Manhattan. (*See* Pl. Ex. 7; Tr. 74:4-5). Chen and Zhou jointly own the business, each holding half of its shares. (*See* Tr. 74:1-3, 107:21-24). Chen and Zhou also shared responsibility for employment decisions. Chen held himself out as the "Boss" of Red Rose, hired employees, dealt with "problem[atic]" employees, instructed employees on their duties, and was involved in employee-compensation decisions. (*Id.* at 107:21-108:22). Zhou was also responsible for interviewing and hiring employees, setting their schedules, determining how much to pay employees, and distributing their compensation. (*Id.* at 74:11-24).

---

[2]    This Court relied on several documents in drafting this Opinion, including the transcript of the trial ("Tr.") and the exhibits that Plaintiffs ("Pl. Ex.") and Defendants ("Def. Ex.") introduced; Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl. FFCL" (Dkt. #34)); Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. FFCL" (Dkt. #35)); and the Stipulations of Fact ("Fact Stip.") contained in the Joint Pretrial Statement (Dkt. #30). For ease of reference, citations to a witness's sworn statements will be referred to using the convention "[Name] Decl."

**B.  Wage Calculations at Red Rose**

Defendants provided scant evidence of how, exactly, the management at Red Rose decided upon the flat-rate daily wages that they paid employees, which likely reflects how little thought was put into the matter.  Although Zhou and Chen testified that they arrived at their wage calculation by relying on the advice of an outside accountant (*see, e.g.*, Tr. 86:11-14, 108:23-109:9), this is not evident from their explanation of how Red Rose employees were paid.

Zhou testified that Red Rose paid its employees based on a daily rate, but she maintained that by dividing that rate by eight hours of each work day and subtracting a credit for tips, employees would receive more than the applicable minimum wage.  (*See* Tr. 84:14-86:24).  Further, although shifts at Red Rose were longer than eight hours, Zhou claimed to have ordered employees to take a 90-minute break during each workday, but explained that employees were to take this break "[w]hen they[ were] not busy" throughout the day.  (*Id.* at 92:17-94:9).  Chen's testimony similarly confirmed that the so-called "breaks" at Red Rose were, in point of fact, simply a characterization of downtime in between serving customers rather than a formal rule or policy.  (*See id.* at 110:25-111:21).

Zhou also admitted, albeit reluctantly, that Red Rose did not pay its employees overtime, but she rationalized that the employees' daily wages adequately compensated them for any work over 40 hours per week.  (*See* Tr. 86:25-88:21).  Chen offered a different excuse; although he admitted that Red Rose did not pay overtime, he claimed that it was unnecessary because

Red Rose would hire more employees during busy work periods. (*See id.* at 110:8-11). Finally, the parties do not dispute that Red Rose employees received a "bonus" of $3 for every 10 minutes of any massage provided to customers. (Fu Decl. ¶ 4; Ng Decl. ¶ 4).

## C.    Plaintiffs' Hours and Wages

The parties dispute how much Red Rose paid each Plaintiff per day and how many hours each Plaintiff worked. Defendants' account of both of these issues is riddled with inconsistencies and lacks documentary corroboration. In contrast, Ng presented detailed notes of her and her employees' work schedules at Red Rose. The Court therefore credits Plaintiffs' version of events.

Defendants presented no evidence that they maintained any record of the hours that Plaintiffs worked. Indeed, Zhou testified that "Red Rose [kept] track of the number of hours that employees worked" by "[telling] them … at the time of the interview … what shift [they were] supposed to work and what hours [they were] supposed to work." (Tr. 90:8-12). Nor did they maintain any record of the daily 90-minute breaks that they claim to have required employees to take throughout the day. (*Id.* at 93:15-17). Conversely, beginning in July 2013, Ng apparently began questioning whether Red Rose was paying her in accordance with law, as she began taking detailed notes not only of the days and hours that she worked, but also the names of the co-workers with whom she worked. (*See id.* at 11:8-12:2; *see generally* Pl. Ex. 1).

The Court conducted an assiduous review of Ng's records, taking note of the amount of days per month for which Ng recorded her hours, the hours that

she recorded working each day, and the days on which she noted working with Fu.[3] These notes largely substantiate Plaintiffs' testimony regarding their usual work schedules, but they are not perfect: They do not encompass the entirety of the work periods for which Plaintiffs seek recovery; on some days, Ng wrote that she was "off" while other days simply have no entry; and the notes do not reflect the hours that Fu worked. Ng's reported hours are also marginally inconsistent, varying both above and below her assigned daily work period. In the main, however, these notes are consistent with Plaintiffs' account of their work at Red Rose, and the Court therefore credits them as corroborating the typical work schedules to which Plaintiffs testified.

Neither side presented documentary evidence of wage payments from Red Rose. Both Plaintiffs received fixed daily wages, but Zhou testified at times that both received more than they claimed to have received. (*Compare* Tr. 14:3-5 (Ng testifying that she received up to $60 per day) *and id.* at 48:10-12 (Fu testifying that she received up to $75 per day), *with id.* at 89:10-90:7 (Zhou testifying that Ng received up to $65 per day and Fu received up to $80 per day). At other times, however, Zhou's testimony on the issue was internally inconsistent, and at the same time consistent with at least one of the Plaintiffs' testimony. (*Compare id.* at 84:14-18 (Zhou testifying that Fu "initially" received "$65, then it became [$]70"), *with id.* at 89:12 (Zhou

---

[3]     Ng's notes refer to one of her coworkers as "Lise." (*See, e.g.*, PL. Ex. 1, at 1). At trial, Fu clarified that her nickname at Red Rose was "Lisa" and confirmed that Ng's notes refer to her. (Tr. 46:20-47:1 (Fu stating that her nickname appears on the first page of Ng's notes)).

testifying that Fu "started from $70")).  And, crucially, Red Rose failed to provide pay stubs or any other wage documentation to Plaintiffs.  (*See id.* at 99:19-100:18).  Given these considerations, the Court credits Plaintiffs' account of the daily wages they received at Red Rose over Defendants' account.

### 1.    Fu's Hours and Wages

Fu worked at Red Rose as a nail technician and beautician from May 2007 to July 15, 2015.  (Fact Stip. ¶¶ 4-5).  In this capacity, she provided customers with manicures, pedicures, waxing, and massages.  (*See* Tr. 51:12-15, 60:2-10).  Fu worked at Red Rose for five days each week, taking off Monday and Thursday.  (Fu Decl. ¶ 6).  Beginning in 2008, Fu worked from 9:00 a.m. to 8:00 p.m., and on Sundays from 10:00 a.m. to 8:00 p.m.  (*Id.* at ¶ 7).  At least once each week Fu would work one to two hours beyond her scheduled end time.  (*Id.*).  She also travelled to Hong Kong for "[a]pproximately three weeks" once every three years during her employment.  (Tr. 13:14-24).

At the outset of her employment at Red Rose, Fu received $65 per day until approximately May 2009, when she began receiving $70 per day.  (Fu Decl. ¶ 3).  In or around June 2011, Red Rose began paying Fu $75 per day, which continued until her departure from Red Rose.  (*Id.*).

### 2.    Ng's Hours and Wages

Ng worked at Red Rose as a nail technician, beautician, and massage therapist from December 2005 until July 28, 2015.  (Ng Decl. ¶ 2; Fact Stip. ¶ 6).  Ng generally worked five days per week, taking off Thursday and Friday; during the summer months of June, July, and August, however, she often

worked six days per week.  (Ng Decl. ¶¶ 7, 8; Tr. 18:9-12).  On Monday and

Tuesday, Ng would usually work from 9:00 a.m. to 8:00 p.m.  (Ng Decl.

¶¶ 6, 8).  Her work schedule for Wednesday, Saturday, and Sunday shifted in

April 2014.  Before that time, she would work from 11:00 a.m. to 9:30 p.m.;

thereafter, she worked from 11:30 a.m. to 10:00 p.m.  (*Id.*).  In the final two

years of her employment at Red Rose, she "occasionally" worked four days per

week during the winter months of January and February.  (Tr. 19:16-20:7; Ng

Decl. ¶ 7).

When Ng began working at Red Rose, she received $50 per day.  (Ng

Decl. ¶ 3).  "Sometime before 2009," her daily wage increased to $55, and in or

around June 2010, it again increased to $60, the rate at which it remained

until the end of her employment at Red Rose.  (*Id.*)

## CONCLUSIONS OF LAW

Based on the foregoing facts, Plaintiffs sought recovery for violations of

the minimum wage and overtime provisions of the FLSA and NYLL, and the

spread of hours, wage notice, and wage statement provisions of the NYLL.  In

light of the NYLL's six-year statute of limitations, NYLL § 198(3), Plaintiffs seek

recovery from six years before the filing of their Complaint — September 21,

2009 — to the end of their employment at Red Rose.[4]  As discussed herein,

Plaintiffs satisfied their burden of proving that Defendants underpaid them,

and although they are not entitled to damages for Defendants' failure to provide

---

[4]     The FLSA has a two-year statute of limitations unless an alleged violation of the statute
was willful, in which case the applicable limitations period is three years.  29 U.S.C.
§ 255(a).

wage notices, they are entitled to damages for Defendants failure to provide wage statements along with their wage payments.  Below, the Court analyzes Plaintiffs' claims before calculating the damages to which Plaintiffs are entitled.

## A. Plaintiffs Are Entitled to Damages for Underpayment of Wages and for Defendants' Failure to Provide Wage Statements

### 1. Applicable Law

#### a. FLSA Coverage

The FLSA's minimum wage and overtime requirements provide coverage to employees who are, in any workweek, (i) "engaged in commerce or in the production of goods for commerce," or (ii) "employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(a), 207(a)(1); *see Hernandez* v. *Jrpac Inc.*, No. 14 Civ. 4176 (PAE), 2016 WL 3248493, at *20 (S.D.N.Y. June 9, 2016).  "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively."  *Jacobs* v. *N.Y. Foundling Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009) (per curiam).  An "enterprise engaged in commerce" and subject to the FLSA includes an enterprise that (i) "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce" and (ii) "whose annual gross volume of sales made or business done is not less than $500,000."  29 U.S.C. § 203(s)(1).

#### b. Burden-Shifting Schemes Under the FLSA and NYLL

The NYLL and FLSA entitle covered employees to wages for work performed.  *Salinas* v. *Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015).  To prevail on a claim for underpaid wages, an employee must show

(i) that he or she performed work without adequate compensation, and (ii) the employer's "actual or constructive knowledge of that work." *Id.* (quoting *Kuebel* v. *Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011)). To determine whether a plaintiff has satisfied this burden, "[w]here an employer's payroll records are inaccurate or incomplete, courts apply a burden-shifting scheme" that is similar under both the FLSA and the NYLL. *Gamero* v. *Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 497 (S.D.N.Y. 2017).

Under the FLSA, where an employer's records of employees' hours and wages are lacking, a plaintiff "need only … submit sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred." *Gamero*, 272 F. Supp. 3d at 497 (alterations in original) (quoting *Gonzalez* v. *Masters Health Food Serv. Inc.*, No. 14 Civ. 7603 (VEC), 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017)). This burden "is not high," and a plaintiff may satisfy it "through estimates based on his [or her] own recollection." *Kuebel*, 643 F.3d at 362. Once a plaintiff satisfies this standard, the employer bears the burden of presenting [i] "evidence of the precise amount of work performed or [ii] … evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Gamero*, 272 F. Supp. 3d at 498 (quoting *Jrpac Inc.*, 2016 WL 3248493, at *27). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Kuebel*, 643 F.3d at 362 (quoting *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).

The burden-shifting framework is similar under the NYLL, but "an employer who fails to keep accurate records shoulders a more stringent burden of proof," which requires the employer to show that the plaintiff "was paid wages, benefits[,] and wage supplements." *Gamero*, 272 F. Supp. 3d at 498 (quoting *Canelas* v. *World Pizza, Inc.*, No. 14 Civ. 7748 (ER), 2017 WL 1233998, at *9 (S.D.N.Y. Mar. 31, 2017)). An employer therefore cannot satisfy its burden "by undermining the reasonableness of an employee's evidence that he [or she] was underpaid." *Id.*

A final consideration on this point: "Although these two burden-shifting schemes impose similar requirements, an employee 'may not receive a double recovery of back wages under both the FLSA and [the] NYLL." *Gamero*, 272 F. Supp. 3d at 498 (alteration in original) (quoting *Jrpac*, 2016 WL 3248493, at *31). "The FLSA and NYLL are compensatory in nature and, therefore, [a] plaintiff's actual damages are measured by the difference between the hourly rate plaintiff actually received and the greater of the state or federal minimum wage." *Yongjie Li* v. *Hiro Sushi at Ollie's Inc.*, No. 16 Civ. 6800 (HBP), 2017 WL 4862071, at *1 (S.D.N.Y. Oct. 25, 2017) (citing *Chowdhurry* v. *Hamza Exp. Food Corp.*, No. 14 Civ. 150 (JBW), 2015 WL 5541767, at *6 n.7 (E.D.N.Y. Aug. 21, 2015)).

### c.  Minimum Wage and Overtime

The minimum wage under the FLSA was $7.25 for the period relevant to this lawsuit. 29 U.S.C. § 206(a)(1)(c). The NYLL also imposed a $7.25 minimum wage from July 24, 2009, until December 31, 2013, when it

increased to $8.00; on December 31, 2014, it increased to $8.75; and on December 31, 2015, it increased to $9.00. NYLL § 652(1); *see Wicaksono* v. *XYZ 48 Corp.*, No. 10 Civ. 3635 (LAK) (JCF), 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), *report and recommendation adopted*, No. 10 Civ. 3635 (LAK), 2011 WL 2038973 (S.D.N.Y. May 24, 2011). These statutes have identical overtime requirements: "Once an employee works 40 hours in a week, he [or she] must be paid 'one and one-half times [his or her] regular rate' for all excess hours." *Gamero*, 272 F. Supp. 3d at 499 (quoting *Dejesus* v. *HF Mgmt. Servs., LLC*, 726 F.3d 85, 88 (2d Cir. 2013)).

### d.  Spread-of-Hours Pay Under the NYLL

If the length of time between the beginning and end of an employee's workday (or the employee's "spread of hours") surpasses ten hours, the NYLL requires the employer to pay the employee an additional hour at the minimum wage rate. *See Gamero*, 272 F. Supp. 3d at 500 (quoting N.Y. Comp. Codes R. & Regs. tit. 12 ("12 N.Y.C.R.R."), § 146-1.6; *Pineda* v. *Tokana Café Bar Restorant Inc.*, No. 16 Civ. 1155 (JPO), 2017 WL 1194242, at *3 (S.D.N.Y. Mar. 30, 2017)). The NYLL's spread-of-hours requirement only applies to employees paid at New York's minimum wage rate (aside from restaurant and all-year hotel employees, who are entitled to spread-of-hours pay regardless of pay rate). *Id.* (quoting *Villar* v. *Prana Hosp., Inc.*, No. 14 Civ. 821 (JCF), 2017 WL 1333582, at *4 (S.D.N.Y. Apr. 11, 2017)).

### e.    Tip Credits

If an employee's cash wages and tips in the aggregate are equivalent to the minimum wage, both the FLSA and the NYLL allow an employer to pay the employee a cash wage that is below the minimum wage by applying a "tip credit" to the employee's wages. *Gamero*, 272 F. Supp. 3d at 500 (quoting *Inclan* v. *N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015)). The statutes impose differing requirements for an employer to claim such credit, but, as relevant here, both require an employer to provide notice to an employee that a tip credit will be deducted from the employee's wages. *Id.*

Under the FLSA, notice to an employee of the employer's application of a tip credit need not be in writing, but it must include: [i] "the cash wage being paid to the employee," [ii] "the amount being claimed as a tip credit," [iii] "a statement that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the tipped employee," [iv] "a statement that all tips received by the employee are to be retained by them except for a valid tip pooling arrangement," and [v] "a statement that the tip credit cannot be used unless the employee has been informed of these tip credit provisions." *Jindan Wu* v. *Nat. Tofu Rest. Corp.*, No. 16 Civ. 3613 (ARR) (ST), 2018 WL 1009274, at *5 (E.D.N.Y. Feb. 20, 2018) (quoting Wage and Hour Division, U.S. Dep't of Labor, *Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA)*); *see also* 29 C.F.R. § 531.59(b). The employer bears the burden of establishing that it satisfied these requirements, and if the employer

fails to do so it shall be liable for the entirety of an employee's minimum wage. *Gamero*, 272 F. Supp. 3d at 501.

A "critical distinction" between the tip-credit requirements of the NYLL and the FLSA is the former's mandate that notice be written and the employer must receive and retain for six years the employee's written acknowledgment of the notice. *See Gamero*, 272 F. Supp. 3d at 501; 12 N.Y.C.R.R. § 146-2.2(c). Indeed, before taking a tip credit, the NYLL requires an employer to "give each employee written notice of ... the amount of tip credit, if any, to be taken from the basic minimum hourly rate" and "[t]he notice shall also state that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate." 12 N.Y.C.R.R. § 146-2.2(a). In addition, the notice must be in English and "any other language spoken by the new employee as his/her primary language." *Id.* § 146-2.2(a)(1)-(2). As with the FLSA, the employer bears the burden to show that it has complied with the NYLL's tip-credit notice requirements. *See Gamero*, 272 F. Supp. 3d at 501.

### f. Liquidated Damages

Both the FLSA and NYLL entitle a plaintiff to liquidated damages, but the analysis under the statutes differs in some respects relevant here and, more generally, a plaintiff may not recover "stacked liquidated damages" under both statutes. *Gamero*, 272 F. Supp. 3d at 504.

"Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages." *Barfield* v. *N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (citing 29 U.S.C.

§ 216(b)).  District courts have discretion, however, "to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA."  *Id.* (citing 29 U.S.C. § 260).  An employer's burden of proof on making such showing is "a difficult one," as good faith requires "active steps to ascertain the dictates of the FLSA and … act[s] to comply with them."  *Id.* (quoting *Herman* v. *RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)).

The NYLL's liquidated damages provision was twice amended during the overall work period for which Plaintiffs seek recovery.  Beginning with the more recent modification, before April 9, 2011, the NYLL assessed liquidated damages at a rate of 25% of lost pay; an amendment, effective on that date, assessed liquidated damages at 100% of lost pay, thereby falling in line with the FLSA. *See Gamero*, 272 F. Supp. 3d at 503-04.  The earlier amendment, effective November 24, 2009, altered the mental state required for an employer to be liable for liquidated damages.  Before the amendment, the NYLL required the *employee* to prove that an employer's violation of the statute was "willful." *Id.* at 503.  This required a showing that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited."  *Hart* v. *Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 937 (S.D.N.Y. 2013) (quoting *Kuebel*, 643 F.3d at 366). The 2009 amendment modified this burden of proof, instead requiring the *employer* to prove good faith, which courts have

construed as making the NYLL substantively indistinguishable from the FLSA. *See Gamero*, 272 F. Supp. 3d at 503 (quoting *Inclan*, 95 F. Supp. 3d at 505).

### g. The NYLL's Wage Notice and Wage Statement Requirements

New York's Wage Theft Prevention Act (the "WTPA") amended the NYLL on April 9, 2011, to provide employees damages if an employer failed to provide wage notices and wage statements containing certain information. *See Pineda v. Frisolino, Inc.*, No. 15 Civ. 3774 (GBD), 2017 WL 3835882, at *12 (S.D.N.Y. Aug. 29, 2017). Two of the WTPA's provisions are relevant here.

The first, NYLL § 195(1), requires employers to provide employees with wage notices within ten days of the beginning of employment. *Gamero*, 272 F. Supp. 3d at 509 (quoting *Kone* v. *Joy Contr. Corp.*, No. 15 Civ. 1328 (LTS), 2016 WL 866349, at *5 (S.D.N.Y. Mar. 3, 2016)). Such wage notice must be written "in English and in the language identified by each employee as the primary language of such employee," and must include a variety of information, including "the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other[.]" NYLL § 195(1)(a). As a consequence of a February 27, 2015 amendment, employees are entitled to recover statutory damages of $50 "for each work day that the violations occurred or continue to occur," up to a total of $5,000. NYLL § 198(1-b); *see Gamero*, 272 F. Supp. 3d at 509 n.12. Because the WTPA does not apply retroactively, employees hired after it was enacted, on April 9, 2011, may not bring claims for wage notice violations. *See Pineda*, 2017 WL 3835882, at *12;

*Canelas* v. *A'Mangiare Inc.*, No. 13 Civ. 3630 (VB), 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015).

A second provision, NYLL § 195(3), requires employers to provide a statement accompanying every wage payment that states information such as the work dates that the payment covers, identifying information of the employer and employee, and information regarding the employee's rate of pay. "Employers who fail to furnish any sort of wage statement are liable under the statute, as are 'employers … [who] fail to comply with all of [Section 195(3)'s] enumerated requirements." *Gamero*, 272 F. Supp. 3d at 511 (alterations in original) (quoting *Severino* v. *436 W. L.L.C.*, No. 13 Civ. 3096 (VSB), 2015 WL 12559893, at *9 (S.D.N.Y. Mar. 19, 2015)). After the February 27, 2015 amendment to the NYLL, employees are entitled to recover statutory damages of $250 "for each work day that the violations occurred or continue to occur," up to a total of $5,000. NYLL § 198(1-d); *Gamero*, 272 F. Supp. 3d at 511 n.14.

### 2. Analysis

#### a. The Court Need Not Decide Whether the FLSA Covers Red Rose

Defendants argue that Red Rose's gross annual sales consistently fell below $500,000 and therefore the business is not subject to the FLSA. (*See* Def. FFCL ¶ 2). In support of this, Defendants submitted tax returns and banking records purporting to show that Red Rose's annual gross revenues were only $272,081 for the 2012 tax year, $317,933 for the 2013 tax year, and $321,933 for the 2014 tax year. (Def. Ex. 1 (tax returns); *see also* Def. Ex. 2 (banking records)). But Zhou admitted that these records only reflected Red

Rose's credit card receipts. (*See, e.g.*, Tr. 103:2-18). The parties therefore dispute the proportion of Red Rose's annual revenue that consisted of cash, relying only on conflicting trial testimony as to such amount. (*Compare* Pl. FFCL ¶ 34 ("Thirty to forty percent of Red Rose's customers paid in cash."), *with* Def. FFCL ¶ 3 ("[C]ash receipts only accounted for approximately ten percent (10%) of Defendants' annual gross volume of sales.")).

In a prior decision in this case, the Court noted that "in determining whether the $500,000 threshold is met, 'there is substantial precedent suggesting that tax returns are not dispositive and the veracity of those documents can be questioned by a Plaintiff[, and likewise] substantial precedent suggesting that factors other than tax returns are relevant.'" *Xiao Dong Fu* v. *Red Rose Nail Salon Inc.*, No. 15 Civ. 7465 (KPF), 2017 WL 985893, at *7 (S.D.N.Y. Mar. 13, 2017) (internal citations omitted). As it happens, the Court does not believe that the issue can, or need be, resolved on this record. As discussed below, Plaintiffs are entitled to damages for unpaid wages, and the NYLL provides a larger recovery than the FLSA because of its higher minimum wage and longer statute of limitations. *See, e.g.*, *Jrpac Inc.*, 2016 WL 3248493, at *31 ("Plaintiffs' damages award under the NYLL necessarily will subsume their award under the FLSA, both because of the higher minimum wage that governed during certain periods and because of the longer period covered by the NYLL."). Thus, whether the FLSA applies at all is less critical because Plaintiffs would only be entitled to recovery under the statute that provided for a higher amount of damages, which here is the NYLL. *See Yongjie*

*Li*, 2017 WL 4862071, at *1. The Court therefore proceeds to determine the extent of Defendants' liability to Plaintiffs under the NYLL.

### b.    Plaintiffs Are Entitled to Damages for Underpaid Wages

Beginning with the burden-shifting scheme discussed above, Defendants concede that they did not maintain sufficient wage records, which they contend "shifts the burden to Defendants 'to show that the inference [that Plaintiffs are entitled to underpaid wages] is not reasonable.'" (Def. FFCL ¶ 16 (quoting *Ramirez* v. *Rifkin*, 568 F. Supp. 2d 262, 273 (E.D.N.Y. 2008)). But this standard is applicable to the FLSA, not the NYLL, and even if it did apply to the NYLL, Defendants fall far short of meeting this burden. Indeed, their Proposed Conclusions of Law provide *zero* argument as to why Plaintiffs have not been paid what they are owed. And, indeed, Defendants admitted that Plaintiffs were paid a daily, rather than hourly, pay rate. Plaintiffs are thus entitled to back wages amounting to the difference between the wages they received and the amount due based on the applicable minimum wage under the NYLL.

And because the Court credited Plaintiffs' account of the touch-and-go break periods at Red Rose, as opposed to the strict 90-minute break that Defendants proffered, Plaintiffs are entitled to wages for the entirety of their daily hours at Red Rose. *See Hart* v. *Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 476 (S.D.N.Y. 2014) ("Under the FLSA, and by extension the NYLL, all of the time worked during a continuous workday is compensable, save for bona fide meal breaks." (citing *IBP, Inc.* v. *Alvarez*, 546 U.S. 21, 37 (2005)); *see also Gamero*, 272 F. Supp. 3d at 499 ("To qualify as a bona fide meal period, '[t]he

employee must be completely relieved from duty for the purposes of eating regular meals.'" (alteration in original) (quoting *Salinas*, 123 F. Supp. 3d at 472)).  Plaintiffs worked over 40 hours per week and often more than 10 hours per day; they are thus owed overtime and spread-of-hours payments.  *See Gamero*, 272 F. Supp. 3d at 499-500.  Finally, Zhou testified that she only provided notice that a tip credit would be deducted from Plaintiffs' wages when they were hired (*see* Tr. 101:17-22), and the record contains no evidence that Red Rose ever provided written notice or received an employee's written acknowledgment of such tip credit.  This fails to satisfy the NYLL's requirements for deducting a tip credit from Plaintiffs' wages.  *See* 12 N.Y.C.R.R. § 146-2.2(c).

### c.     Plaintiffs Are Entitled to Liquidated Damages

The periods for which Plaintiffs seek recovery span the NYLL's amendments regarding liquidated damages, during which the mental state required for such an award became more favorable to plaintiffs by shifting from the employee's proof of "willfulness" to the employer's proof of "good faith."  But because Defendants would be liable for liquidated damages under either standard, Plaintiffs are entitled to liquidated damages for the entirety of the periods for which they seek recovery.

Although Defendants contend that they "were aware of their obligations under the FLSA and [the NYLL] and made attempts to comply with" those statutes, the record is bereft of any such efforts.  (Def. FFCL ¶ 5).  To be sure, both Zhou and Chen maintained that they compensated employees after

consulting with an accountant, but as the Court noted above, judging from Red Rose's flawed wage practices, it is skeptical of any meaningful consultation on labor law issues. They provided no evidence, documentary or otherwise, to corroborate their testimony on this point. *See, e.g.*, *Salustio* v. *106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 557 (S.D.N.Y. 2017) (rejecting good faith defense to liquidated damages award where employer provided "no information or documentation as to who [the purported accounting professionals] were and how they held themselves out to the public").

The Court cannot find either that Defendants acted with reasonable grounds for believing that their wage practices satisfied the NYLL or that they did not act with reckless disregard for the illegality of these practices. *See, e.g.*, *Garcia* v. *JonJon Deli Grocery Corp.*, No. 13 Civ. 8835 (AT), 2015 WL 4940107, at *6 (S.D.N.Y. Aug. 11, 2015) (rejecting good faith defense where "even assuming there was subjective good faith on the Defendants' part, Defendants d[id] not point to any misleading advice tendered by either the accountant or another professional that could support their claim of objectively reasonable grounds for Defendants' violations"). Indeed, Defendants' claimed accounting advise does more harm than good — assuming they did receive such advice and that it was accurate, Defendants would have had knowledge of their obligations under the labor laws while acting in clear violation of those standards.

Plaintiffs are thus entitled to liquidated damages under the NYLL at a rate of 25% of lost pay for the work periods before April 9, 2011, when the

liquidated damages provision was amended, and 100% of lost pay thereafter.

*See Ni* v. *Bat-Yam Food Servs. Inc.*, No. 13 Civ. 07274 (ALC) (JCF), 2016 WL

369681, at *2 (S.D.N.Y. Jan. 27, 2016) (holding that 2009 and 2011

amendments to NYLL's liquidated damages provision do not apply retroactively

and separately analyzing relevant time periods); *McLean* v. *Garage Mgmt. Corp.*,

No. 09 Civ. 9325 (DLC), 2012 WL 1358739, at *9 (S.D.N.Y. Apr. 19, 2012)

("There is no evidence of legislative intent to apply the 100% liquidated

damages amendment retroactively.").

> **d.    Plaintiffs Are Entitled to Damages for Defendants'
> Failure to Provide Wage Statements, But Not for
> Defendants' Failure to Provide Wage Notices**

Defendants provided Plaintiffs with neither a wage notice at the outset of

their employment nor statements accompanying Plaintiffs' wage payments.

(*See* Tr. 100:8-18 (Zhou admitting that she did not provide employees with

documentation confirming wages)).  Both Plaintiffs began working at Red Rose

before April 9, 2011, however, and they therefore cannot recover under the

WTPA for Defendants' failure to provide wage notices at the beginning of their

employment.  *See Pineda*, 2017 WL 3835882, at *12.

Plaintiffs *are* entitled to damages for Defendants' failure to provide

regular wage statements, however.  *See, e.g.*, *Canelas*, 2015 WL 2330476, at

*5-6 (awarding summary judgment to plaintiff who was hired before April 9,

2011, on wage statement but not wage notice claims).  Fu worked at Red Rose

until July 15, 2015, while Ng worked at Red Rose until July 28, 2015.  Thus,

both Plaintiffs worked at Red Rose for over 20 work days after the WTPA was

amended on February 27, 2015, to allow employees to recover $250 each work day that the violations continued, up to a total of $5,000. *See* NYLL § 198(1-d); *Gamero*, 272 F. Supp. 3d at 511 n.14. Plaintiffs are thus entitled to $5,000 each for Defendants' violations of NYLL § 195(3).

### e. Plaintiffs Are Entitled to Prejudgment Interest

The NYLL allows an employee to collect prejudgment interest on his or her actual damages in addition to, and not compounded on, liquidated damages and damages for wage statement and wage notice violations. *See Gamero*, 272 F. Supp. 3d at 515. The applicable interest rate under New York law is nine percent per year, and courts tend to use the midpoint of an employee's employment within the limitations period as the start of the period for which interest accrues. *Id.*

### 3. Damages Calculation

The Court thus proceeds to discuss its calculation of the damages that Defendants owe Plaintiffs, beginning with Fu.

### a. Fu's Damages

For the purposes of calculating Fu's damages, to account for variances in Fu's actual rate of pay, and the applicable minimum wage and liquidated damages rates, the Court split Fu's full period of employment within the limitations period into five smaller segments: (i) September 21, 2009, through April 9, 2011; (ii) April 10, 2011, through May 31, 2011; (iii) June 1, 2011, through December 31, 2013; (iv) January 1, 2014, through December 31, 2014; and (v) January 1, 2015, through July 15, 2015. The Court based its

calculation of Fu's actual pay and weekly work schedule on her testimony; on this basis, Fu's work schedule for the relevant period consisted of four 11-hour days per week and one 10-hour day per week.

A few caveats: *First*, although Fu may have worked one or two hours beyond her scheduled end time each week, the record contains no evidence beyond her testimony to determine when or how frequently she would do so. The Court therefore did not increase her work time based on this testimony. *Second*, Fu admitted to traveling to Hong Kong for approximately three weeks once every three years during her time at Red Rose, but the record does not establish when such travel occurred. The Court therefore cannot determine the applicable pay rates (both actual and required) for the periods during which Fu was away. Out of fairness to the parties, however, the Court will deduct a total of six weeks from Fu's wages — two in the first period identified above, and one from each of the remaining four — reflecting a minimum of two trips during the relevant limitations period.

Within this framework, the Court computes Fu's underpaid wages as follows:

- September 21, 2009, through April 9, 2011: Fu was paid a weekly wage of $350 for 79 weeks. During this period, she was entitled to a minimum hourly wage of $7.25 for 40 hours per week, amounting to $22,910. She was entitled to overtime for 14 hours per week at a rate of $10.88, amounting to $12,033.28. She was entitled to spread-of-hours pay at $7.25 per hour for four hours per week, amounting to $2,291. In total, this amounts to **$9,584.28** less than she was actually paid.

- April 10, 2011, through May 31, 2011: Fu was paid a weekly wage of $350 for 6 weeks. During this period,

she was entitled to a minimum hourly wage of $7.25 for 40 hours per week, amounting to $2,100. She was entitled to overtime for 14 hours per week, at a rate of $10.88, amounting to $913.92. She was entitled to spread-of-hours pay at $7.25 per hour for four hours per week, amounting to $174. In total, this amounts to **$727.92** less than she was actually paid.

- June 1, 2011, through December 31, 2013: Fu was paid a weekly wage of $375 for 134 weeks. During this period, she was entitled to a minimum hourly wage of $7.25 for 40 hours per week, amounting to $38,860. She was entitled to overtime for 14 hours per week, at a rate of $10.88, amounting to $20,410.88. She was entitled to spread-of-hours pay at $7.25 per hour for four hours per week, amounting to $3,886. In total, this amounts to **$12,906.88** less than she was actually paid.

- January 1, 2014, through December 31, 2014: Fu was paid a weekly wage of $375 for 51 weeks. During this period, she was entitled to a minimum hourly wage of $8 for 40 hours per week, amounting to $16,320. She was entitled to overtime for 14 hours per week, at a rate of $12, amounting to $8,568. She was entitled to spread-of-hours pay at $8 per hour for four hours per week, amounting to $1,632. In total, this amounts to **$7,395** less than she was actually paid.

- January 1, 2015, through July 15, 2015: Fu was paid a weekly wage of $375 for 27 weeks. During this period, she was entitled to a minimum hourly wage of $8.75 for 40 hours per week, amounting to $9,450. She was entitled to overtime for 14 hours per week, at a rate of $13.125, amounting to $4,961.25. She was entitled to spread-of-hours pay at $8.75 per hour for four hours per week, amounting to $945. In total, this amounts to **$5,231.25** less than she was actually paid.

Thus, Fu's actual damages for the period before April 9, 2011, are $9,584.28; she is entitled to liquidated damages consisting of 25% of this amount, or $2,396.07. Her actual damages for the period after April 9, 2011, are $26,261.05; she is entitled to liquidated damages consisting of 100% of

this, or $26,261.05.  Her total actual damages are $35,845.33, plus

prejudgment interest calculated annually at 9% from the midpoint of her

employment period within the limitations period, or August 17, 2012.  As

discussed above, she is also entitled to $5,000 in damages for Defendants'

wage statement violations.

### b.    Ng's Damages

To calculate Ng's damages, the Court similarly separated her full period

of employment within the limitations period into four smaller segments:

(i) September 21, 2009, through April 9, 2011; (ii) April 10, 2011, through

December 31, 2013; (iii) January 1, 2014, through December 31, 2014; (iv) and

January 1, 2015, through July 28, 2015.  As with Fu, the Court based its

calculation of Ng's actual pay and weekly work schedule on her testimony.

Based on her account, Ng's work schedule for the relevant period

consisted of two 11-hour days per week and three 10.5-hour days per week.  In

the summer months of June, July, and August, she worked an additional day,

and the Court assumed that this extra day was 10.5 hours, as were the

majority of her work days during the non-summer months.  As an additional

assumption relevant to Ng's damages calculation, she testified that she worked

four days per week during the winter months of January and February, but the

record is bereft of any precision as to the frequency with which she did so

during that period, providing at most that she did so "occasionally."

(Tr. 19:16-20:7; *see* Ng Decl. ¶ 7).  The Court therefore did not, as it could not

with any degree of accuracy, take this into account when calculating Ng's wages.

Within these parameters, the Court calculated the wages that Defendants owe Ng as follows:

- September 21, 2009, through April 9, 2011: During non-summer months, Ng was paid a weekly wage of $275 until June 1, 2010, when Red Rose raised her daily wage from $55 to $60. During summer months, she received a weekly wage of $350. From September 1, 2011, through April 9, 2011, she received a weekly wage of $300. During this period, she was entitled to a minimum hourly wage of $7.25 for 40 hours per week, amounting to $23,490. She was entitled to overtime at a rate of $10.88; she was entitled to 14 hours of overtime per week during summer months, amounting to $1,980.16, and 13.5 hours of overtime per week during non-summer months, amounting to $9,987.84. She was entitled to four hours in spread-of-hours pay at a rate of $7.25 each week, amounting to $2,349. In total, this amounts to **$14,027** less than she was actually paid.

- April 10, 2011, through December 31, 2013: During non-summer months, Ng was paid a weekly wage of $300. During summer months, she received a weekly wage of $350. During this period, she was entitled to a minimum hourly wage of $7.25 for 40 hours per week for 142 weeks, amounting to $41,180. She was entitled to overtime at a rate of $10.88; she was entitled to 14 hours of overtime per week during summer months, amounting to $5,940.48, and 13.5 hours of overtime per week during non-summer months, amounting to $15,128.64. She was entitled to four hours in spread-of-hours pay at a rate of $7.25 each week, amounting to $4,118. In total, this amounts to **$21,817.12** less than she was actually paid.

- January 1, 2014, through December 31, 2014: During non-summer months, Ng was paid a weekly wage of $300. During summer months, she received a weekly wage of $350. During this period, she was entitled to a minimum hourly wage of $8 for 40 hours per week for

52 weeks, amounting to $16,640. She was entitled to overtime at a rate of $12; she was entitled to 14 hours of overtime per week during summer months, amounting to $2,184, and 13.5 hours of overtime per week during non-summer months, amounting to $6,318. She was entitled to four hours in spread-of-hours pay at a rate of $8 each week, amounting to $1,664. In total, this amounts to **$10,856** less than she was actually paid.

- <u>January 1, 2015, through July 28, 2015:</u> During non-summer months, Ng was paid a weekly wage of $300. During summer months, she received a weekly wage of $350. During this period, she was entitled to a minimum hourly wage of $8.75 for 40 hours per week for 30 weeks, amounting to $10,500. She was entitled to overtime at a rate of $13.13; she was entitled to 14 hours of overtime per week during summer months, amounting to $1,470.56, and 13.5 hours of overtime per week during non-summer months, amounting to $3,899.61. She was entitled to four hours in spread-of-hours pay at a rate of $8.75 each week, amounting to $1,050. In total, this amounts to **$7,520.17** less than she was actually paid.

Thus, Ng's actual damages for the period before April 9, 2011, are $14,027; she is entitled to liquidated damages consisting of 25% of this amount, or $3,506.75. Her actual damages for the period after April 9, 2011, are $40,193.29; she is entitled to liquidated damages consisting of 100% of this, or $40,193.29. Her total actual damages are $54,220.29, plus prejudgment interest calculated annually at 9% from the midpoint of her employment period within the limitations period, or August 24, 2012. As discussed above, she is also entitled to $5,000 in damages for Defendants' wage statement violations.

**CONCLUSION**

For the reasons set forth above, the Court concludes that Plaintiffs are entitled to relief on their claims for underpaid wages and wage statement violations. The Clerk of Court is directed to prepare a judgment reflecting the Court's holding and setting forth Plaintiffs' damages as follows:

> Fu: $35,845.33 in unpaid wages under the NYLL, with 9% prejudgment interest accruing from August 17, 2012; $28,657.12 in liquidated damages; and $5,000 for Defendants' violation of NYLL § 195(3).

> Ng: $54,220.29 in unpaid wages under the NYLL, with 9% prejudgment interest accruing from August 24, 2012; $43,700.04 in liquidated damages; and $5,000 for Defendants' violation of NYLL § 195(3).

"[I]f any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent." NYLL § 198(4).

\*\*\*

Plaintiffs are also entitled to recover their costs and "reasonable attorney's fees." NYLL § 663(1). Should the parties be unable to settle on Plaintiffs' attorney's fees, Plaintiffs are ORDERED to file a motion for fees and costs **on or before April 30, 2018**. Defendants shall oppose the motion **on or before May 30, 2018**. Plaintiffs may not file a reply brief.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    March 26, 2018
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge